G. H. Williamson, Co. Atty., Stephenville, and Ernest S. Goens, State's Atty., Dallas, for the State.

Chas. Nordyke, Stephenville, for defendant.

KRUEGER, Judge.

On the 25th day of May, 1949, during the preceding term of this court, we dismissed the appeal in this case, 220 S.W. 2d 662, because the record failed to show that any judgment had been entered upon the minutes of the court. Appellant, in due time, filed a motion to reinstate the appeal and caused a supplemental transcript to be filed in this court showing entry of a final judgment. Therefore, the appeal will be reinstated and the case will be disposed of on its merits.

Appellant brings forward a number of complaints, but in view of the disposition we are making of this case, we deem it only necessary to discuss his complaint challenging the sufficiency of the evidence to support the judgment of conviction. •

It was charged in the complaint and information that "on or about the 11th day of April, A.D. 1948, R. L. Tate Jr. did then and there unlawfully, while intoxicated and while under the influence of intoxicating liquor, drive a motor vehicle, to-wit: A 1942 Model Ford Four Door Sedan, upon a public highway within said county, to-wit: U. S. Highway #108 about two miles north of the City of Stephenville, Texas, * * *."

We have carefully examined the statement of facts, but we are unable to find any evidence therein that he drove a motor vehicle upon U.S. Highway No. 108. There is evidence to the effect that he drove his automobile on Highway 108, but this does not meet the allegations that it was U.S. Highway No. 108. The state, having particularly described the highway, was required to prove it as charged in the complaint and information. The identical question here presented was before this court in the following cases: Walker v. State, 136 Tex.Cr.R. 368, 125 S.W.2d 571; Malone v. State, 135 Tex.Cr.R. 169, 117 S.W.2d 779; and Spencer v. State, 118

Tex.Cr.R. 336, 42 S.W.2d 259. It will thus be noted that the averment and the proof fail to correspond. In other words, there is a variance between the allegation and the proof which calls for a reversal of the judgment.

The judgment is reversed and the cause remanded.

Opinion approved by the Court.

PANHANDLE PUBLISHING CO., Inc. v. FITZJARRALD.

No. 5969.

Court of Civil Appeals of Texas. Amarillo.

Sept. 19, 1949.

Rehearing Denied Oct. 15, 1949.

See also 215 S.W.2d 659.

636

Sanders, Scott, Saunders & Smith, Amarillo, and W. J. Bragg, Memphis, for appellant.

Hamilton & Deaver, Memphis, for appellee.

PITTS, Chief Justice.

This is a libel suit filed by appellee, J. O. Fitzjarrald, against appellant, Panhandle Publishing Company, Incorporated, to recover actual damages in the sum of $25,000 and exemplary damages in the sum of $10,-000, because of the publication by appellant in its newspaper, the Amarillo Times, of several alleged libelous articles concerning appellee as a citizen and a public official. He was County Attorney of Hall County at the time of the publications. Appellee alleged, in substance, that the articles com-

plained of were published with the intent to injure him by humiliating him and for the purpose of subjecting him to public hatred, contempt and ridicule and further for the purpose of impeaching his honesty, integrity and reputation both as a private citizen and as a public official. He further alleged that the statements made by appellant in the said articles were false, scandalous, defamatory, malicious, libelous and therefore damaging to him and that such statements were willfully and maliciously published by appellant with express malice toward appellee and for the purpose of inferring by innuendo that appellee was wholly unfit to serve Hall County as County Attorney. Appellee further alleged that he had properly conducted himself and the office he held and there was no just cause for appellant to make any such vicious false statements about him.

Appellant answered with a number of special exceptions and a general denial. It further alleged in substance that the publications about which appellee complains were privileged, or at least conditionally privileged, in that such was a fair and reasonable report and comment about a matter of public interest and concern published by appellant without malice for general information at a time when appellee was serving as County Attorney and running for re-election and that such does not therefore give rise to a cause of action for libel; that the matters complained of were true or that appellant, after a careful and conscientious inquiry in Hall County, believed them to be true at the time of the publication; that the articles were not maliciously published, nor were any of the statements published with malice of any kind or character, or wrongful intent or with any intention whatever to injure appellee. Appellant further pleaded the contents of a letter that Raymond Ballew sent to some 2500 voters of Hall County on April 19, 1948, making substantially the same statements that appellant made in its publication, which publication of appellant went into the homes of approximately one hundred subscribers of Hall County. Appellant further pleaded that the statements complained of by appellee had been given

wide publicity in Hall County generally both in writing and orally before such had been published in the Amarillo Times.

In order to better understand the facts out of which this litigation grew, it is well to state that during the year of 1947 Raymond Ballew, a long time resident of Hall County, had been several times convicted in the county court of the said county on liquor law violations for which he had paid fines totalling more than $8,000. He had announced for Sheriff of Hall County against the incumbent, Earl Hill. The said Raymond Ballew was conducting a vigorous campaign for the office of sheriff and was attacking the manner in which alleged law violators had been apprehended and the manner in which the Hall County court had been conducted. Ballew mailed out approximately 2800 circular letters to the voters in Hall County in which letters he apparently criticised the sheriff, county judge and county attorney of Hall County, all of whom were running for reelection. In that letter we find the following excerpts taken therefrom:

"The office of Sheriff is an important one, and as a citizen of this county, I do not like to see the authority vested in it abused, nor do I like to see those who come before it or under its authority mistreated. I believe that when a man takes the oath of office of Sheriff he is taking on the obligations of a public trust and that he should and must conduct himself, both publicly and privately, in a manner that is in keeping with confidence that the people of the county have placed in him by electing him to this position.

"If I am elected your sheriff, I will not tolerate a condition such as a Negro living in back of a judge's home and selling liquor for what information he can give others.

"I will not put a man in jail without giving him right to make bond.

"I will not commit perjury just to get a conviction. And you will never hear of my saying that it is all right for a sheriff to perjure himself to get a conviction of a person he doesn't like. I think everyone should be treated alike.

"I will not say that the county is not big enough for me and some other man too, nor will I threaten to kill a man I don't like.

"I will not fire a deputy for telling the grand jury the truth. That's the kind of deputies I want.

"I will not employ deputies that acknowledge that they gave whiskey to school boys. I will fire one that does.

"I will not give a child ten cents to turn in his father, just so I can get a fine.

"I will not allow a county attorney to carry a gun around and pull it on Negroes just to scare them.

"I will not let a county attorney run the sheriff's office, nor will I try to run his. I will cooperate with him in every way and expect him to discharge his duties and I will take care of mine.

"In view of these beliefs, I will not tolerate nor take part in any of the Star Chamber methods of Hitler and the fake trial techniques of Stalin. If a man is accused of any crime or misdemeanor I want him to have a decent trial that is fair and one in which justice will be done. I do not believe that a man is 'guilty until proven innocent,' but that he is innocent until he is proven guilty! I want the evidence established by good, truthful witnesses, and not by drunken perjurers and snitches."

Someone sent a copy of the said letter to appellant's Amarillo Times. Upon receipt of the letter by appellant, two reporters were sent to Memphis, the county seat of Hall County, to check up on the letter and the political situation in the sheriff's race there. The reporters interviewed Ballew, Sheriff Hill, several other citizens including some of the Negroes. They tried to interview appellee but he declined to discuss with them the Ballew letter or charges therein made. The management of the Amarillo Times thought the subject matter furnished a news story of interest to the public and as a result published the article in question along with some others.

Appellee declared upon three publications dated, respectively, April 28, 1948, April 29, 1948 and August 9, 1948. The instant case was tried to a jury in the trial court and the only publication submitted to it was that of April 29, 1948. This article, which furnished the basis of this suit, in its entirety was as follows:

"Memphis 'Political Clique' Accused of Kangaroo Court
"By Bill Cox and Hampton Stennis
"(Times Staff Writers)
"Third in a Series

"Memphis—Is this Hall county seat big enough for both Raymond Ballew, admitted ex-bottlegger and possible sheriff candidate, and Sheriff Earl E. Hill?

"That's the heavy question for county residents, who are watching with avid interest as the political fight between the two grows in intensity.

" 'The sheriff once told me that this town is not big enough for me and him and he asked me to sell my house and move,' Ballew told Times reporters.

"Sheriff Hill denied making this statement.

" 'Ballew has lived here longer than I have, and he's been in the bootlegging business most of that time,' said Hill. 'What I did tell him was that this town is not big enough for me to be sheriff and Ballew continue to be a bootlegger.'

"In his now county-famous 'An Open Letter to the Good People of Hall County,' Ballew tossed severe insinuations at a portion of the present county administration. Orally, he referred to the sheriff's office, county attorney and county judge, as a 'political clique.'

"He wrote in his 'letter' that he, as sheriff, would not 'tolerate nor take part in the star chamber methods of Hitler and the fake trial techniques of Stalin.'

" 'If a man is accused of any crime, I want him to have a decent trial that is fair and one in which justice will be done,' wrote Ballew. 'I want the evidence established by good, truthful witnesses and not by drunken perjurers and snitches.'

"Ballew accused Sheriff Hill of deputizing known bootleggers of Hall County to bring about his (Ballew's) conviction on liquor violations for which he paid more than $8,000 fines in 1947.

"In relations to alleged activities of this nature, an Amarillo man, Lloyd Henson, 2106 West First, in a volunteer telephone conversation to the Times, said, 'Hill and the county attorney tried to get me to snitch on bootleggers in Memphis. They offered to let me set up a domino hall and fix me up to make some money. But I told them I wasn't going to snitch on anybody.'

" 'This one-legged infantryman ain't afraid of any sheriff with a little badge,' Henson declared.

"He continued: 'On the night of the Cotton Carnival last fall a state man came to my house. They must have thought I was bootlegging and it made me mad. I went to the sheriff's office and asked Hill about it and he said he didn't send the liquor man down. But he came in Earl's car. They offered me my expenses to drive to Amarillo and Wichita Falls to watch liquor stores and cars,' and Henson.

"Henson lived in Memphis at this time, he said.

"Talking to reporters, Ballew and other sources told of liquor raids and other calls in which the county attorney Otho Fitzjarrald, accompanied members of the sheriff's office and carried a gun.

"Ballew alleged that Fitzjarrald, controls county court proceedings.

"Citing an example, Ballew said on one occasion County Judge John Russell attempted to overrule two court motions before the attorney involved had an opportunity to make them.

" 'I want to make a couple of motions,' Ballew quoted the lawyer as saying.

" 'Overrule them both,' he said Judge Russell declared with a sweep of his arm emphasizing the statement.

"Fitzjarrald interrupted and said, 'Judge, he will have to make the motions before you can overrule them,' according to Ballew.

"The attorney said to have been thus overridden lives in Amarillo. He declined to comment on the episode, saying merely, 'I have a lot of business down there and can't afford to comment on it.'

"County Attorney Fitzjarrald refused to make any statements concerning the various accusations made by Ballew, saying merely, 'I'm not interested—not the slightest.'

"Sheriff Hill had spoken previously in defense of the county attorney. He said Fitzjarrald did not wear a gun and did not have a permit to carry a gun.

"But 'Up on the Hill'—the southeast section of town where the negroes live—at least eight negroes interviewed by newsmen told a story of living in terror of the Hall county attorney and and law enforcement officers. They declared sheriff's officers and the county attorney pay almost nightly visits to 'The Hill.' They said Fitzjarrald once fired several shots close to the feet of a negro 'just to scare him.'

"One negro man summing up activities of the county attorney declared, 'I know he be's down heah but I don't know what he do's. I know that when I sees him a comin', I leaves.'

"The negroes questioned substantiated Ballew's 'Open Letter' statement which insinuated sheriff's officer unmercifully beat and cursed a negro cotton picker. They said the negro, originally from Corsicana, was accosted in a cafe 'on the hill' by Deputy Sheriff Grant Evans and Sheriff Hill. They said Evans beat and kicked the negro and when the negro started to pray, told him: 'Don't pray to the Lord, you black so-and-so. Pray to me.' They said Hill joined in the beating.

"In regard to this, Hill told reporters, 'The nigger got smart.'

"The negroes said common believe 'on the hill' is that the officers and county attorney 'enjoy scarin' us niggers.'

"In another 'charge' in his 'open letter' Ballew wrote:

" 'I will not give a child ten cents to turn in his father just so I can get a fine.'

"Ballew claimed that Hill and a deputy raided the home of a Lakeview man suspected of bootlegging. The officers, Ballew said, gave a four-year-old son of the suspect a dime to tell where his father hid his whiskey. Ballew said the boy, after receiving the coin, told them the liquor was underneath the car hood. The officers found it there.

"Sheriff Hill told this story: 'The kid came in the room and asked us 'Do you want to know where the whiskey is?' and we told him we did. His mother came in then and took him out, but he wandered back in a little later and my deputy asked him where the whiskey was. He told us and we found it there. Then, as we left, the deputy handed the boy a dime and said 'Thanks.' ·

"How do the people of Hall County feel about Ballew's 'open letter' and chanches of being sheriff? Many of them declined to comment for personal reasons. Most of those who would talk have strong convictions.

"Ballew has lived in Memphis since 1902. Many people who do not like him declare he is an excellent businessman and can be depended upon to keep his word.

" 'If he would use his talents, he is capable of doing just about anything he makes up his mind to do,' one person said.

"One woman said the situation reminded her of one that once existed in the hills of Tennessee.

"During a hot political campaign, the main issue was whether squirrels should be shot. In the middle of a campaign speech, a voice from the rear of the audience asked the speaker: 'How do you stand on the squirrel-shooting question?'

"The candidate replied, 'Fifty per cent of my friends are in favor of shooting them. The other fifty per cent of my friends are agin it. My friends, I'm one-hundred percent for my friends.' "

Appellee declared upon a certain portion of the foregoing article and the trial court instructed the jury concerning that said portion as follows:

"You are further instructed that the article appearing in the Amarillo Times dated April 29th, 1948, headlined 'Memphis Political Clique Accused of Kangaroo Court', a portion of which, to wit, 'But upon the hill the southeast section of town where the nagroes live—at least eight negroes interviewed by newsmen told a story of living in terror of the Hall County Attorney and law enforcement officers. They declared sheriff's officers and the county at-

torney pay almost nightly visits to the hill. They said that Fitzjarrald once fired several shots close to the feet of a negro just to scare him.' is set out in paragraph 8 of the plaintiff's second amanded original petition is, as a matter of law, a libel of the plaintiff J. O. Fitzjarrald, and that malice on the part of the defendant, Panhandle Publishing Company is imputed, as a matter of law, to the defendant unless the defendant, Panhandle Publishing Company establishes by the greater weight of the evidence introduced in your hearing that the material charges appearing in such article relating to the plaintiff, J. O. Fitzjarrald, are substantially true, that is, are true in substance."

In answer to special issue number one the jury found that the charges concerning appellee set out in the instructions given it by the trial court were not substantially true and upon further instructions by the trial court as to the manner of determining actual damages, the jury found that appellee was entitled to actual damages in the sum of $14,330. Upon further issues submitted to it by the trial court, the jury found that the article in question was not published by appellant with actual malice toward appellee and no exemplary damages were therefore awarded to appellee. Upon the verdict of the jury judgment for actual damages in the sum of $14,330 was entered for appellee from which an appeal was perfected.

Appellant attacks the judgment, charging error on the part of the trial court contending that the article in question, or any part thereof, was not libelous but that the article and every part of it was at least conditionally privileged. It further contends that the article was privileged upon the sole condition of whether or not the same was published and circulated by appellant with actual malice toward appellee. The jury found that the article in question had not been published and circulated by appellant with actual malice toward appellee. Appellant therefore contends that, in view of such jury finding, judgment should have been rendered in favor of appellant.

Appellee contends that this court in a venue hearing in this same case reported in

215 S.W.2d 659, 660, has heretofore determined whether or not that part of the article in question then presented to this court was libelous and whether or not the same was conditionally privileged under the provisions of Subdivision 4 of Article 5432, Vernon's Annotated Statutes. He further contends that this court there found against appellant's contentions and that the questions now raised by appellant are res judicata.

In the venue case only the following part of the said article was before this court.

"But, upon the hill, the southeast section of town where the negroes live, at least eight negroes interviewed by newsmen told a story of living in terror of the Hall County Attorney and law enforcement officers. They declared sheriff's officers and county attorney paid almost nightly visits to 'the hill'. They said Fitzjarrald once fired several shots close to the feet of a negro 'just to scare him'."

■■■ This court held in the venue case that the above and foregoing constituted the entire article according to the record then presented to us. This court further held in the venue case that plaintiff had a right to declare on any portion of the published article "but, in determining whether or not the portion complained of was libelous, the words and phrases conceived and alleged to be libelous should not be considered separate and apart from their settings, but should be construed with reference to the entire news item." In support of such a rule we cited the case of Times Pub. Co. v. Ray, Tex.Civ.App., 1 S. W.2d 471, which case was affirmed by the Supreme Court in Tex.Com.App., 12 S.W. 2d 165. Such rule still prevails. What we considered in the venue case to be the entire article is not the entire article by any means as shown by the record before us in this case on its merits. Appellee as plaintiff in the trial of this case on its merits introduced in the trial court the whole article out of which only the excerpt above quoted was introduced during the venue trial. The entire article before us now is more than ten times as long as the selected excerpt introduced at the venue hearing. The selected excerpt about which appellee complains must now be construed in connection with all other statements made in the entire article. The whole background that gave rise to the litigation is before us now while only a very limited part of the background for such was before us on the venue hearing. We definitely have a very different factual situation before us as compared with the factual situation before us in the venue case. We are not therefore bound by any conclusions we may have reached as we considered a different factual situation.

■■■ In the case of Farmers' Seed & Gin Co. v. Brooks, 125 Tex. 234, 81 S.W. 2d 675, the Commission of Appeals held that a distinction should be noted between a trial upon a plea of privilege and the trial upon the merits of a case. The former is to determine whether the complaining defendant is suable on the transaction involved where plaintiff filed the suit, while the latter suit is to determine defendant's liability on the transaction. It is not contemplated in a hearing on a plea of privilege that any matters shall be tried other than such as are necessary to determine the venue issue. In such cases, after the plea of privilege has been filed, then plaintiff sets out specifically the facts relied upon to confer venue where the case is pending. Defendant is not required to plead all of the defenses in a venue hearing. Bradley v. Trinity State Bank, 118 Tex. 274, 14 S. W.2d 810.

■■■ In the instant case appellant's conditional privileged plea was a defensive matter applicable to the hearing of the case on its merits. It being a defensive matter it was not necessary to present it in the venue hearing and it was not fully presented, if presented at all, at such hearing.

Article 5430, Vernon's Annotated Statutes, defines libel as follows:

"A libel is a defamation expressed in printing or writing, or by signs and pictures, or drawings tending to blacken the memory of the dead, or tending to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule, or financial injury, or

to impeach the honesty, integrity, or virtue, or reputation of any one, or to publish the natural defects of any one and thereby expose such person to public hatred, ridicule, or financial injury. Acts 1901, p. 30."

The published article and that portion of it declared upon by appellee as a basis for recovery makes reference to the official acts of appellee and other officials. Appellant is therefore entitled to the benefit of the statutory defense set out in Article 5432, especially the first part of the said Article, together with Section 4 thereof, which provides that:

"The publication of the following matters by any newspaper or periodical shall be deemed privileged and shall not be made the basis of any action for libel. * * * Sec. 4. A reasonable and fair comment or criticism of the official acts of public officials and of other matters of public concern published for general information."

■ In construing the foregoing article, it has been many times held that any such publication must be made without actual malice.

■ In the case of Express Pub. Co. v. Wilkins, Tex.Civ.App., 218 S.W. 614, 617, the court holds that the question of whether a publication is privileged or not is a question of law for the court to determine under the statutory definition of such but the question of actual malice is a question of fact and the court cites ample authorities in support of both rules. That case was reversed and remanded for the purpose of determining the issue of actual malice. In that case one of the publishing company's defenses was that the article in question was qualifiedly or conditionally privileged and published without actual malice, just as appellant here contends. The publishing company lost in the trial court but preserved its points and presented them to the appellate court. In construing the law applicable to the issues there presented Chief Justice Fly, speaking for the San Antonio court, said:

" * * * but the publication, if libelous otherwise, can be justified only on the ground that it was a reasonable comment on or criticism of the official acts of the appellee, or that it was a fair and reasonable comment on or criticism of a matter of public concern published for public information. The latter portion of that clause is very broad and expansive and opens up a fertile field for investigation. It will be noted, as suggested in the Light Pub. Co. v. Huntress case, [Tex.Civ.App., 199 S.W. 1168], that no absolute privilege of publication is granted to newspapers and periodicals, but the privilege is qualified by the provision that it will be destroyed by 'proof of actual malice.' The publication of the matters named in the statute is permitted on grounds of public policy, for the purification and protection of the public service and as a safeguard against the corruption or inefficiency of public servants. The purity of society and the preservation of the rights of the citizens demand the widest and most thorough ventilation of the public acts of public officials, who are in theory, and should be in practice, the faithful servants of the people, and when publication of their acts is made with fair comment on or criticism of such acts, untainted by actual malice, the publication will be an should be given the full protection accorded by the statute.

" * * * Without 'actual malice' back of and inducing a publication in regard to the matters named in the statute and herein pointed out, there is not nor can be any basis for damages."

In the case of Nunn v. Webster, Tex. Com.App., 260 S.W. 157, Webster, city tax assessor and collector and a candidate to succeed himself, sued Nunn, owner and publisher of the Amarillo Daily News, for libel. After a hearing the trial court instructed the jury for Nunn, the publisher. This court, 248 S.W. 711, reversed and remanded the case but the Commission of Appeals, in an opinion approved by the Supreme Court, reversed this court and affirmed the judgment of the trial court. In that opinion the Commission said [260 S.W. 158]:

"The Court of Civil Appeals reversed and remanded the cause (248 S.W. 711), holding that the article published is libelous per se, and that—

" 'Before the published matter under consideration can be classed as qualifiedly

privileged it must be found that the facts stated in the body of the article are true.'

"If this be correct, there could be no such rule as qualified privilege. The showing under proper pleadings that statements claimed to be libelous are true is a perfect defense to a charge of libel. It is idle to say that one must show a perfect defense before he can avail himself of the defense of a supposed privilege.

"* * *. The published article is clearly a comment and criticism of his conduct of the office made in view of his candidacy.

"In the case of Cotulla v. Kerr, 74 Tex. 89, 11 S.W. 1058, 15 Am.St.Rep. 819, Justice Henry says:

"'When a libelous publication relates to a person in office it may affect him in his personal or official character. If it relates to him personally alone it is governed by the same rules that apply to an individual. If it applies to him as an officer the better opinion seems to be that to make it actionable per se the charge must be of such a nature that if true it would be cause for his removal from office. Id. 211, 212; Robbins v. Treadway, 2 J.J.Marsh. 540, [19 Am.Dec. 152].' * * *

"Actual malice cannot be inferred from the character of the language used, without other evidence to indicate it."

In the case of Enterprise Co. v. Wheat (a county sheriff), 290 S.W. 212, writ dismissed, the publishing company lost the suit in the trial court but the Beaumont Court of Civil Appeals reversed and rendered the case. In that opinion the court discusses at length the libel laws and construes the law governing conditional privileged publications and held that the publishing company was not liable.

In the case of International & G. N. R. Co. v. Edmundson, 222 S.W. 181, 183, the Commission of Appeals said:

"From the falsity of the charge or imputation, unless the occasion is privileged, malice is inferred. This inference arises from the fact that no motive other than malice appears. If the occasion is privileged, a proper and sufficient motive is shown; and thereby the inference of malice

is repelled, and in lieu thereof the presumption obtains that the communication was made in good faith. It then devolves upon the plaintiff to establish, by evidence other than the falsity of the charge or imputation, that malice in fact existed."

In the instant case appellee charges that appellant sought by innuendo to injure him by that part of the publication declared upon. In the case of the Enterprise Company v. Wheat, supra, the court said [290 S.W. 217]:

"It is the well-settled rule in this state, by the decisions of our Supreme and appellate courts, that the meaning of an article claimed to be libelous cannot be enlarged or extended by innuendo. If the language used in the article as a whole, when taken in its usual and ordinary meaning, is not reasonably susceptible of the meaning sought to be given it by innuendo, the innuendo must fail."

It has been held that a person holding a public office or a candidate for such has put his character in issue insofar as his qualifications for such are concerned. His character and fitness for such a position held or sought are matters of public concern, and are proper subjects for discussion and fair and reasonable comment. Such may be published for general information. Fair comment and criticism of the acts and conduct of such a person during his tenure of office or candidacy for such, pertaining to the issues or his fitness for such office, are privileged if made in good faith. Light Pub. Co. v. Huntress, Tex.Civ.App., 199 S.W. 1168; Moore v. Davis, Tex.Civ.App., 16 S.W.2d 380, affirmed Tex.Com.App., 27 S.W.2d 153; Cooksey v. McGuire, Tex.Civ.App., 146 S.W.2d 480.

In the case of Houston Printing Co. v. Hunter, Tex.Civ.App., 105 S.W.2d 312, 316, approved by the Supreme Court 129 Tex. 652, 106 S.W.2d 1043, Justice Speer, speaking for the Fort Worth Court of Civil Appeals, said:

"* * * In late years there has been a very just recognition of the beneficent influence possessed by newspapers over our people. As time has passed, means

have been perfected by which our better papers have been enabled to quickly and accurately place before its readers all matters of public concern, and readers have learned to rely upon their favorite publication to keep them posted on public affairs. This condition has brought about a public necessity to permit newspapers and periodicals to speak frankly yet fairly in all matters when published for general information of their reading public."

It appears to us, after a careful consideration of the entire article, of that portion of the same declared upon by appellee and submitted to the jury, together with the remainder of the article, and of the evidence concerning the same, that appellant gave the source of its information and the source of the statements contained in the article; that through its reporters, it interviewed the parties mentioned in the article, and some that were not mentioned, quoting them in the main, and gave a fair and impartial report of what each said; that appellant's reporters tried to interview appellee but he declined to comment on the matters further than to say he was not interested, which statement appellant quoted in the article. It further appears that appellant gave a fair report of both sides of a political campaign and did not vouch for the truthfulness by implication or otherwise of any of the statements made. It further appears that the article in question and every part of it was written in good faith and there is ample evidence to support the jury finding that no actual malice existed on the part of appellant.

Applying the foregoing authorities and rules of law, all of which still prevail, to the facts in the case, it is our opinion that the article in question and each part of it was conditionally or qualifiedly privileged. In view of this holding and the finding of the jury that no actual malice existed, appellant's position in the matter must be sustained.

It results from the views expressed herein that the judgment against appellant should be reversed and judgment here rendered in its favor. It is therefore so ordered.

On Motion for Rehearing.

PER CURIAM.

In his motion for a rehearing appellee first contends that the alleged libelous statements about which he complains were made by appellant against appellee "individually and not as a public officer." It is our opinion that the record does not support such contention.

Appellee further contends as a part of his second complaint that this court erred in holding to be conditionally or qualifiedly privileged the alleged statements made by appellant to the effect that appellee belonged to a political clique who "used Star Chamber Methods of Hitler and the fake trial techniques of Stalin, used drunken perjurers and snitches * * *" in conducting the courts of Hall County. Appellee contends that he denied such charges in the trial court and that "The jury found such statements were not true." The record before us reveals that the trial court limited its submission of the issues to the jury to the alleged libelous statements "appearing in the newspaper article mentioned in paragraph 3" of the court's charge and to those statements alone. That portion of the alleged libelous statements submitted to the jury by the trial court has been heretofore quoted by us from the trial court's charge in the original opinion and it makes no reference to the said language heretofore set out, about which appellee complains in his motion for a rehearing. According to the record the above and foregoing alleged libelous statements about which appellee complains in his motion were not submitted to the jury and no request was made for their submission to the jury. Compaints formerly made about those alleged libelous statements were therefore waived by appellee when the case was submitted to the jury without including them. Such were not therefore passed upon by this court.

Appellee's motion for a rehearing is in all things overruled.